IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

SHERRY L. H.,[1]

        Plaintiff,

vs.

MARTIN O'MALLEY,
Commissioner of Social Security,

        Defendant.

No.  23-CV-4027-CJW-KEM

**REPORT AND
RECOMMENDATION**

---

**TABLE OF CONTENTS**

I.  **BACKGROUND** ............................................................................. 2

II.  **DISCUSSION** ............................................................................ 20

  A.  ***The Sitting and Standing RFC Determination*** ......................................... 21

  B.  ***Lack of Regional Job Numbers*** ......................................................... 25

  C.  ***Additional Medical Records*** ............................................................. 35

III.  **CONCLUSION** ........................................................................... 37

Plaintiff Sherry L. H. seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  Plaintiff

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

argues that the ALJ should have included a limitation in her residual functional capacity (RFC) allowing her to shift positions at will and also should have elicited testimony from a vocational expert (VE) on the number of jobs available regionally. Plaintiff also seeks a limited remand for the consideration of newly submitted medical records. I recommend **reversing** the ALJ's decision and **remanding** for further proceedings.

## I.  BACKGROUND

Since 1995, Plaintiff has worked as a beautician, cutting and dying hair. AR 53.[2] She opened her own salon in the small town where she lives in 2005. *Id.* She began volunteering as an EMT[3] in 2017, and she took a part-time job as an EMT for the ambulance for the local hospital in August 2018 (while continuing to work at her beauty salon). AR 46, 54, 486. Prior to her alleged onset date, and while engaging in substantial gainful activity, she received treatment for chronic neck pain and associated migraines, non-epileptic seizures, depression, and anxiety. She saw neurologist Eugenio Matos, MD; physician assistant Linda Kauker for psychiatric medication management; and therapist Kelli Willis, CSW. Plaintiff's children were adults, and she lived alone.

On August 26, 2020, while Plaintiff was working as an EMT, a combative patient in police custody assaulted Plaintiff, kicking her ribs on the right side and pinning her up against the ambulance wall with the patient's feet. AR 416. Plaintiff initially complained of rib and abdominal pain on the right side, which providers treated with Toradol injections (an NSAID[4]), tramadol (an opioid), and muscle relaxers (Norflex, substituted a few days later with baclofen), as well as stating she could take previously prescribed Mobic (meloxicam, an NSAID) (which was stopped a few days later and replaced with

---

[2] "AR" refers to the administrative record below, filed at Docs. 6-2 to 6-21.

[3] Emergency Medical Technician.

[4] Nonsteroidal anti-inflammatory drug.

2

diclofenac, another NSAID), Valium for muscle spasms (a benzodiazepine), and Percocet (oxycodone/paracetamol, an opioid). AR 410, 415-16. About two weeks after the incident, Plaintiff reported that her rib and abdominal pain had improved, but that she now suffered low back pain and hip pain on the right side. AR 406. She said that it felt like her hip popped out a few days ago, causing pain with walking and extending into her groin and right leg. *Id.* On objective examination, Physician Assistant Chanesse Schaefer (at Plaintiff's primary care provider's office in Canton, South Dakota, along with Karsten Rohlfs, MD) observed distressed appearance; an antalgic gait when getting on the examination table; mild right sacroiliac (SI) joint pain (in her low back) with palpation and with the pelvic rock test; mild pain with the Stinchfield's test;[5] negative FABER[6] and pelvic compression tests; normal straight leg raises; and normal range of motion and strength in the hip and lower extremities. AR 409; *see also* AR 405. Hip and lumbar spine x-rays showed mild arthritis but no fractures. AR 409. PA Schaefer indicated she would not refill Plaintiff's opioids; she instructed Plaintiff to trial the Toradol pills Dr. Rohlfs had prescribed four days earlier and if no improvement, switch to Relafen (an NSAID). AR 406-07.

From September 11, 2020, to October 13, 2020, Plaintiff participated in eight physical therapy sessions, and she also received a back brace to wear with activity. AR 393, 402-05. Physical therapy initially resulted in improvement of her right groin, buttock, and hip pain (reducing it from a 9/10 to a 3/10), and PA Schaefer cleared her to return to work for half days with a lifting restriction on September 28 (after observing mild SI joint tenderness; negative straight leg raises; negative Stinchfield's and log roll

---

[5] "Stinchfield's test measures the strength and flexibility of the hip extensors and the integrity of their tendons." ***Audrey M.H. v. Berryhill***, No. 17-cv-4975 (ECW), 2019 WL 635584, at *6 n.8 (D. Minn. Feb. 14, 2019).

[6] "The Flexion Abduction External Rotation (FABER) test is commonly utilized as a provocation test to detect hip, lumbar spine, or sacroiliac joint pathology." ***Id.*** at *6 n.6.

3

tests;[7] and normal leg range of motion and strength). AR 393, 400. Plaintiff worked at the salon three days that week, although she noted being on her feet caused increased pain. AR 394-95. The next week, she was able to work a six-hour day styling hair, noting a slight increase in discomfort but overall improvement. AR 393. She also noted staying with her parents, who lived about an hour away, on weekends to help care for her mother. AR 394-95, 773, 788. On October 12, she worked a half day doing desk work for her EMT job and answering phones, which resulted in increased pain (6/10) in her right groin and SI joints, although her physical therapist noted she maintained improved strength and mobility. AR 380, 393. She reported increased pain limited her activities of daily living, like mowing her lawn, and her physical therapist noted that despite previous improvement, she could no longer squat, kneel, or walk one to two blocks without increased pain. AR 393. On October 13, Plaintiff's physical therapist noted they would suspend therapy until her appointment with PA Schaefer the next week. AR 393.

Plaintiff met with PA Schaefer on October 19, 2020, reporting worse pain with the increase in activity and doing "better standing than in other positions." AR 379-80. She also noted, however, that she was out of Relafen, one of the medications that she had been using for pain control and that helped her pain more than other NSAIDs. AR 380, 400. PA Schaefer noted Plaintiff exhibited "mild distress" when getting on the exam table, had tenderness over her right SI joint and mid buttock, and positive Stinchfield's and log roll tests. AR 383. PA Schaefer also observed normal pelvic rock, pelvic

_____

[7] "The log roll test is used to assess for acetabular labral pathology and general hip joint laxity . . . . The examiner maximally internally and externally rotates the femur, comparing range of motion bilaterally. The presence of clicking may indicate a labral tear." *Burris v. Astrue*, No. CV 08-4206, 2010 WL 3074391, at *21 n.20 (D.S.D. June 15, 2010) (quoting **Andrea B. Austin** et al., *Identification of Abnormal Hip Motion Associated With Acetabular Labral Pathology*, 38 J. Orthopaedic & Sports Therapy 558, 558 (2008)), *report and recommendation adopted,* 2010 WL 3074390 (Aug. 5, 2010).

compression, and FABER tests; full range of motion of Plaintiff's legs; and normal hip and leg strength. *Id.* PA Schaefer refilled Plaintiff's Relafen and baclofen and ordered a lumbar spine MRI,[8] which Workers' Compensation denied. AR 383-84. PA Schaefer noted Plaintiff had an upcoming appointment with physical medicine, through which she might have better luck getting approval for an MRI. AR 384.

On November 3, 2020, Plaintiff met with her neurologist, Dr. Matos. AR 371-72. She reported no seizures since her last appointment in early September 2019. *Id.* She reported her headaches had been stable until a month ago, noting she had gone to her primary care provider for a sumatriptan injection to treat her headaches three times over a two- to three-week span. *Id.* Dr. Matos noted Plaintiff had received an antibiotic for a sinus infection around the same time and posited that her headaches were likely due to sinus issues. *Id.* He said she could restart meloxicam for headaches, however, but then she would need to stop taking Relafen. *Id.* He advised her to follow up in six months unless her headaches or seizures worsened. *Id.*

Plaintiff applied for DI benefits on November 4, 2020, alleging disability since the date of the assault. AR 78. Throughout November 2020, Plaintiff complained of hip and back pain, worsened with sitting for a long time and with certain activities. AR 356-57, 363, 370. In early November, Plaintiff met with Peter Johnson, MD, at physical medicine in Sioux Falls, SD (about thirty minutes away from the small town where Plaintiff lived). AR 370-71. He noted discomfort with rotation of the right hip, "some point tenderness" on palpation to the right SI joint, "a little bit of discomfort" with right-sided straight leg raises, and full hip and leg strength. *Id.* Dr. Johnson believed Plaintiff's pain was likely an SI joint dysfunction problem, and he recommended physical therapy targeted at stabilizing the SI joint and an SI joint injection (for pain relief as well as diagnostic purposes). *Id.* He also instructed her to switch from Relafen back to

---

[8] Magnetic Resonance Imaging.

meloxicam, as Dr. Matos had recommended to treat her migraines, noting the switch might also help her hip issues. *Id.* Dr. Johnson noted that if therapies targeted at the SI joints did not improve Plaintiff's pain, she might have a labral tear, which would require a right hip MRI to diagnose. *Id.* Plaintiff had the SI joint injection in mid-November and returned to physical therapy, attending eight more sessions through early December. AR 356, 368, 864, 870, 875. On November 23, 2020, Plaintiff met with physician assistant Kyle Cochran at Sanford Orthopedics & Sports Medicine (at Dr. Johnson's referral), also in Sioux Falls. AR 354-57. PA Cochran observed antalgic gait, good range of motion of the right hip (but pain with external rotation), some weakness with right hip flexion but otherwise normal hip strength, normal log roll and straight leg tests, and positive deep squat position and flexion adduction internal rotation tests. AR 356, 870; *see also* AR 365 (antalgic gait, right SI joint tenderness, and negative straight leg tests observed on date of SI joint injection about a week prior). Because Plaintiff reported physical therapy and the right-sided joint injection provided only some relief, PA Cochran thought Plaintiff might have a labral tear, and he recommended a right hip MRI. AR 356, 362, 781, 853. He instructed Plaintiff to rest, ice, and take meloxicam and Tylenol while waiting for the MRI, but not to take muscle relaxers or other NSAIDs until after the MRI. AR 353.

Before agreeing to pay for the MRI, Workers' Compensation wanted to review the footage of the assault to see where Plaintiff had been kicked. AR 353-54. Plaintiff was in such pain that she attempted to schedule the MRI earlier by going through her own health insurance (which would result in some out-of-pocket cost to her), but the orthopedics office refused to put her on the MRI cancellation list because of Workers' Compensation. *Id.* Plaintiff ultimately underwent a right hip MRI arthogram on December 17, 2020, which showed a labral tear. AR 870, 944-46. PA Cochran recommended continued conservative management, with a corticosteroid injection into the hip socket as both a diagnostic and therapeutic measure and physical therapy focused

6

on the right hip (as opposed to the lower back and SI joints) (it seems Plaintiff attended four sessions). AR 865, 870, 1024.

Plaintiff also began complaining of increased neck pain and headaches in late November 2020. AR 2958. She called to schedule a repeat occipital nerve cervical medial branch rhizotomy, a procedure to burn nerve endings in the neck to stop them from sending a pain signal to the brain. AR 720-23, 876-80, 2958. She had previously had four such procedures, the last one in May 2020, which generally provided great relief for her migraines—she reported after the May 2020 procedure, her headaches improved by 95% until late November. *Id*. She did note, however, that she suffered increased pain in the first week after the May 2020 rhizotomy that was so severe she suffered a seizure requiring ER treatment; so she received a prescription of injectable sumatriptan to help with initial post-rhizotomy pain control. AR 352, 2958. In the meantime, on December 1, Dr. Rohlfs gave her an IV solution for her migraines containing Dilaudid (hydromorphone), Toradol, and Benadryl, among other things, and a prescription for twelve tablets of immediate release oxycodone. *Id*. Plaintiff underwent the cervical rhizotomy on December 10; twelve days later, she reported feeling 90% better and that she had noticed the most improvement to her neck pain and headaches in the last two to three days. AR 2952.

Before Plaintiff received the corticosteroid injection for her hip, treatment records reflect that she continued to complain of hip pain limiting her mobility (she said she could only walk three blocks), and providers observed antalgic or unsteady gait, some hip weakness, and pain with hip movement. AR 853, 862-63, 865, 867, 870. On January 5, 2021, she told her therapist she was having increased seizure activity at home and that she had suffered a seizure a few weeks ago after consuming alcohol at a bar. AR 864. She also said that preparing to celebrate the holidays with her children that night exasperated her injury. AR 863. The next day, she went to the ER for extreme hip pain;

she was given an IV[9] of Toradol and fentanyl and discharged with oxycodone tablets to last until the injection. AR 855-63. She received the corticosteroid injection on January 8, 2021, which improved her hip range of motion immediately afterward. AR 853. In late January, she reported that the injection helped initially, but that her hip pain had returned after taking a trip to Florida (she reported walking around on the plane, feeling good while in Florida, and taking it easy). AR 843, 852-53. She said she could not cut hair because she could not stand for thirty minutes. *Id*. The orthopedics office recommended she return to physical medicine, noting that it seemed like she had another source of pain besides the hip tear, such as the SI joint. *Id.; see also* AR 846-47. She met with Christopher Janssen, MD, at physical medicine in mid-February 2021. AR 836-37. He observed normal strength in the lower extremities, pain with right hip internal rotation, and lumbar spine tenderness to palpation on the right side. AR 837. He ordered a lumbar spine MRI, which was normal. AR 834-35, 837, 942-43.

Also in mid-February, Plaintiff had an appointment with Dr. Matos, her neurologist. AR 835. She reported five to six brief seizures a year where she felt somewhat confused but did not suffer a definite loss of consciousness. *Id*. She also reported one to two migraines a month, treated effectively with sumatriptan, as well as meloxicam (which helped decrease the number of headaches), gabapentin, and a low dosage of topiramate. *Id*. Dr. Matos increased her topiramate and meloxicam dosages (topiramate from 50 milligrams twice a day to 100 milligrams twice a day). *Id*. A few days later, Plaintiff called the surgeon who performed the cervical rhizotomy, reporting 90% pain relief after the rhizotomy until two weeks ago, when the pain returned. AR 2953. He instructed her to follow up with Dr. Janssen, her referring provider. *Id*.

On February 26, 2021, the Social Security Administration denied Plaintiff's disability application on initial review. AR 77-84. Plaintiff later reported visiting her

---

[9] Intravenous line.

parents that day and helping clean her grandmother's home after a flood, causing increased pain. AR 776. The next day, Plaintiff attempted suicide by overdosing on her medications and was discovered unconscious by law enforcement during a wellness check; she was hospitalized for five days and then discharged with plans to live with her parents for a while (she could not be discharged to an inpatient psychiatric placement because of testing positive for a bacterial infection). AR 806-829. Upon discharge, Plaintiff did not have any prescription medications, as they had been discarded as the result of her suicide attempt. AR 773, 783, 829.

On March 8, she told Dr. Rohlfs that she had been taking Cymbalta daily and that she had not needed to use her sumatriptan for headaches very often; Dr. Rohlfs instructed her to decrease her topiramate dose (for headaches) by at least 25 milligrams up to 50 milligrams since she complained of feeling lightheaded and dizzy. AR 783. The next day, she had a telehealth appointment with Dr. Janssen in which she complained of SI joint pain (but not cervical pain or headaches); Dr. Janssen said they would do another SI joint injection and continued work restrictions of limited bending and twisting, lifting no more than ten pounds, and four-hour workdays. AR 781-82. On March 19, Plaintiff called Dr. Rohlfs, noting bad hip pain aggravated by riding in the car to doctor's appointments (she was living with her parents who lived an hour and a half from Sioux Falls); Dr. Rohlfs prescribed seven days' worth of medications "for safety" and noted they could be refilled frequently. AR 773. At a psychiatric appointment a few days later, Plaintiff noted that medications (Toradol and muscle relaxant Flexeril (cyclobenzaprine)) "helped a great deal" and that she could be "up and more functional" when taking medications, although she also said she did not want to have to depend on pain medications. AR 766-67, 769. Her therapist noted "in her mind she could not work while taking these medications." AR 767.

Plaintiff moved back to her house in late March and adopted a dog for companionship. AR 758-59, 769. She also noted a new boyfriend and reported she

would soon begin teaching middle schoolers CPR[10] for about an hour once a week. AR 758-59, 767. In late March, Dr. Rohlfs refilled her medications by telephone and referred her to the pain clinic for a long-term solution, noting that none of the specialists seemed to identify the source of Plaintiff's pain. AR 766. On April 6, 2021, Dr. Janssen gave her an SI joint injection, which Plaintiff later reported provided limited relief. AR 751-56, 761-63. On April 14, 2021, she attended training through her EMT job (which consisted of watching videos) to obtain her certificate to conduct drug testing. AR 286, 767.

On April 15, 2021, she had her first appointment with nurse practitioner Tara Lee at the pain clinic. AR 751-53, 766. Plaintiff reported pain in her low back and right hip, buttock, and groin that she rated at a 6/10 on the pain scale. AR 752-53. She said that at times, her pain was so severe that she suffered burning pain and muscle spasms in her right groin, resulting in urinary incontinence. *Id.* She also noted she had begun having pain on the left side from overcompensating for right-side pain. *Id.* She stated that it was hard to do daily chores due to difficulties twisting, bending, and stooping, and that standing more than twenty minutes caused a lot of pain. *Id.* NP Lee observed a lump on Plaintiff's right lower back (previously undiscovered by any other provider) that was tender to touch and that when pushed, sent pain and tingling symptoms radiating into Plaintiff's buttock and groin. AR 750, 752. NP Lee also noted on objective examination that Plaintiff exhibited pain and muscle spasms. AR 753. NP Lee gave Plaintiff a trigger point injection into her right buttock, where NP Lee had observed a muscle spasm; ordered a CT[11] scan of Plaintiff's right hip; changed Plaintiff's muscle relaxer from Flexeril to carisoprodol; instructed her to continue meloxicam; and prescribed immediate release morphine tablets (15 milligrams every eight hours as needed, with a maximum of

_____

[10] Cardiopulmonary resuscitation.

[11] Computed tomography.

two tablets a day). AR 751-52. The next week, Plaintiff returned to the pain clinic, reporting that the immediate release morphine improved her pain but made her so drowsy that she needed to nap, and by the time she woke up, her pain had returned. AR 748. NP Lee prescribed a controlled release morphine to take twice a day, with the immediate release morphine to use for breakthrough pain as needed. AR 747-48. NP Lee also referred Plaintiff to urology for her urinary incontinence symptoms, and the urologist recommended pelvic floor physical therapy. AR 747-48, 1238.

Around this time (mid-April to early May), Plaintiff reported "getting out more" with her boyfriend, traveling to Arizona for her son's wedding, celebrating her son's birthday, attending her daughter's graduation, and going on a few EMT calls with "significant restrictions," although she did report performing CPR on one call (and suffering increased pain and a seizure after the call). AR 742, 745, 748, 750, 1066. She underwent a repeat right hip MRI arthogram on May 7, 2021, which still showed the labral tear, less apparent than in the December 2020 MRI, and no new tear. AR 1146. A few days later, she called the pain clinic, reporting increased pain since the injection of contrast dye for the MRI, and NP Lee reminded her to use immediate release morphine for breakthrough pain. AR 1063-64.

On May 12, 2021, Plaintiff presented to the ER after suffering from a seizure. AR 1054-55, 1057. She reported suffering from two hour-long seizures the prior week with semi-lucid intervals in between episodes when she would become stiff. *Id.* She reported another episode lasting about thirty-five minutes that night. *Id.* She noted that her seizures had been managed fairly well on topiramate until recently, when she had decreased the dosage from 100 milligrams twice a day to only once a day. *Id.* She also posited an increase in stress contributed to increased seizures. *Id.* She was discharged after a head CT was normal. AR 1141-42.

She returned to the pain clinic the next day, reporting pain in the left buttock from overcompensating. She said she used controlled release morphine, unless she had to

work or drive, because then she did not want her mental state altered. AR 1052. She noted morphine helped reduce her pain a little, but the immediate release worked better. *Id.* She complained that months ago, her pain had suggested a labral tear, which was confirmed by an MRI, "just to be told that isn't causing my pain." AR 747. She said her goal was to reduce her pain enough so that she could plant flowers, work, and return to some of her regular daily activities. *Id.* NP Lee instructed her to take the controlled release morphine twice a day on a schedule, like it was prescribed; gave her a trigger point injection into her left buttock and hip; and referred her to orthopedic surgeon Travis Liddell, MD, for a second opinion. AR 1052.

Two days later, on May 15, 2021, Plaintiff presented to the ER for dehydration. AR 1039-50. She said she had been outside all day working in the yard, pulling weeds and doing yard work for a few hours, and had not been eating or drinking. *Id.* She became overheated and passed out. *Id.* She improved after receiving IV fluids. *Id.*

Later in May 2021, she had appointments with Dr. Janssen at physical medicine and Nathan Skelley, MD, at Sanford orthopedics. AR 1030-32, 1038-39. Dr. Janssen noted cervical spine tenderness on palpation, normal lower extremity strength, and that "slump sit testing" for the lumbar spine did not cause "typical pain symptoms." AR 1039. Dr. Janssen continued her current work restrictions and suggested Plaintiff obtain a second opinion. *Id.* Two days later, Dr. Skelley advised Plaintiff to lift all restrictions to work on improving her core and hip strength and her stability, and Dr. Janssen agreed to defer to Dr. Skelley. *Id.* Dr. Skelley noted normal gait, tenderness on palpation to the left SI joint, pain with flexion and extension of the spine, slightly worse range of motion and hip strength on the right side than the left, and a negative right straight leg raise test causing low back pain. AR 1031. Plaintiff refused to twist side to side on objective examination based on Dr. Janssen's restrictions. AR 1038. Dr. Skelley believed the recent MRI showed the labrum tear had improved. AR 1031. When he told

12

Plaintiff no surgery would improve all her symptoms, Plaintiff walked out of the appointment. AR 1032.

On June 2, 2021, Plaintiff attended physical therapy for the first time since February for core strengthening, balance, and improved activity tolerance. AR 1024. The next week, she had her first appointment with Dr. Liddell at Avera orthopedics, seeking a second opinion. AR 1964-68. Plaintiff claimed groin pain at a 5-6 on the ten-point pain scale. *Id.* On objective examination, Dr. Liddell noted tenderness to palpation of the right SI joint, limited range of motion due to pain, positive impingement and Stinchfield's tests, and negative log roll, FABER, and straight leg raise tests. *Id.* Dr. Liddell noted the most recent MRI showed a tear and "small areas of chondromalacia on the acetabulum as well."[12] Because conservative measures had not provided Plaintiff with relief, Dr. Lidell recommended surgery—a "right hip arthoscopy with labral repair, psoas tenotomy[,] and . . . femoroplasty."[13] AR 1968, 2025.

In the month before surgery, Plaintiff reported sitting outside and weeding to ease anxiety; renting her salon out since she was unable to perform haircuts; going on one EMT call; alternating sleep throughout the night between her bed and recliner due to pain; and not feeling up to participating in Fourth of July activities. AR 1288, 2538. In

---

[12] The acetabulum is a part of the hip bone. *Acetabulum*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/acetabulum (last visited August 9, 2024). Chondromalacia occurs when the cartilage that covers the ends of bones and reduces friction "softens and breaks down." *Chrondromalacia of the Hip*, Steve Yoon MD, https://www.steveyoonmd.com/hip/chondromalacia/ (last visited August 9, 2024).

[13] A psoas tenotomy involves cutting the psoas tendon to "release" it. *Iliopsoas Tenotomy: Relieve Pain of the Iliopsoas Tendon*, *Florida Orthopaedic Institute*, https://www.floridaortho.com/specialties/hip-thigh/iliopsoas-tenotomy/#:~:text=In%20scientific%20terms%2C%20this%20treatment,your%20leg%20a%20certain%20way (last accessed August 9, 2024). "Femoroplasty is the removal of bony irregularities from and reshaping of the femur." *Joanne G. v. Berryhill*, No. EDCV 18-0997-JPR, 2019 WL 2303833, at *8 n.23 (C.D. Cal. May 29, 2019).

13

therapy, she recognized that "a lot of this is her stepping away and being afraid to put herself out there." *Id.* Plaintiff also underwent a repeat cervical rhizotomy procedure on June 29, 2021, noting 90% relief in her headaches from the December 2020 procedure until three weeks ago. AR 2913.

On July 14, 2021, Dr. Liddell performed hip surgery, repairing the labral tear, releasing muscle, and grinding down the ball and socket and some tendons. AR 57, 1974-77. NP Lee completed an FMLA form indicating Plaintiff could not work for three months while she recovered from surgery. AR 1970. Plaintiff could not bear weight on her right hip for four weeks while she recovered and had to use a walker, lift chair, and shower stool at home. AR 1271. Her mother came to stay with her (Plaintiff had recently broken up with her boyfriend), and friends and other relatives also came to check on her. AR 1271, 2534. She used higher dosages of morphine prescribed by NP Lee for post-operative pain. AR 1270-71. Plaintiff's disability application was denied on reconsideration on July 16, 2021. AR 85-94.

Plaintiff participated in physical therapy from July 22 to September 28, attending about twice a week. AR 1482-1521, 1576-84, 1623-64, 1684-1703, 1714-34, 1746-53, 1799-1808, 1858-1916, 1930-33. By early August (while still using crutches to keep weight off her hip), she reported no back pain and hip pain reduced to a 2/10 on the pain scale, despite not taking morphine for the last two days. AR 1844, 1847, 1856. Her physical therapist noted improved range of motion, increased strength, and no pain, and instructed Plaintiff to slowly start bearing weight on her right hip at home. AR 1804. Plaintiff reported more pain with increased activities—including gardening, fixing her washing machine, walking, going shopping, and doing haircuts and colors—and ultimately resumed taking her pain medications in late August to help her sleep. AR 1650, 1658-61, 1689-91, 1698, 1718-21, 1732. By August 30, 2021, she reported walking the dog and doing yard work with less discomfort afterward. AR 1636, 1639, 1648. In early September 2021, Plaintiff visited relatives for a week and engaged in

14

increased walking (over 2 miles over varied surfaces on inclines and declines). AR 1625. She initially reported more soreness after this trip but was able to resume activities after resting. AR 1516, 1519, 1621, 1625. She reported mild headaches at appointments in early August and mid-September 2021 (one of the times she was suffering from bronchitis) and canceled a neurological appointment with Dr. Matos around this time. AR 1526, 1678, 1844. In mid-September, Plaintiff's physical therapist noted improved range of motion, gait, balance, tolerance to activity, strength, and standing, and recommended she talk with the pain clinic about weaning from her pain medications. AR 1516. The next week, Plaintiff noted attending a conference and struggling to sit for long periods, and at physical therapy, she reported increased pain and muscle tightness following a seizure. AR 1498, 2525-27. She also noted suffering from a migraine and "some sort of bug." AR 1498. In late September, Plaintiff continued to report increased pain (despite using pain medications), and her physical therapist noted decreased range of motion and tolerance to exercises and walking. AR 1486-87, 1496-99. Based on her decline in strength, her physical therapist wondered if "something tore loose" and suggested they stop physical therapy until she followed up with Dr. Liddell, her surgeon. AR 1486-87, 2522.

On September 30, 2021, Dr. Liddell ordered a new MRI arthrogram of Plaintiff's right hip. AR 1228. In early October, Plaintiff reported driving to Sioux Falls for a therapy appointment, noting a recent "fun encounter" with a friend but "struggl[ing] to move" the next day. AR 2522. She met with NP Lee at the pain clinic on October 13, 2021, reporting a one-week period where she did not need pain medications until her pain returned. AR 1401. NP Lee increased her dosage of controlled release morphine. AR 1408. A few days later, Plaintiff underwent a right hip MRI arthrogram and CT scan, which showed postsurgical changes but was inconclusive as to whether a tear existed. AR 1205-06, 2011. Dr. Liddell noted that sometimes tears did not show up on imaging, and based on Plaintiff's symptoms and objective examination, decided to proceed with a

15

second right hip arthoscopy with a labral repair if needed. AR 1401, 2010, 2602. On November 8, 2021, Plaintiff underwent a second hip surgery; Dr. Liddell once again repaired a labral tear in Plaintiff's right hip, as well as performed a femoroplasty, psoas tenotomy, and acetabuloplasty.[14]

Plaintiff participated in right hip physical therapy from November 15, 2021, through at least February 13, 2022, attending about twice a week. AR 2397, 3057. On December 1, 2021, she reported stopping opioids three days prior and suffering no hip pain. AR 2312, 2336. By mid-December, she noted she was getting around without using crutches for the most part. AR 2211. By December 22, she had met all short-term goals, including having the same hip range of motion on the right side as on the left, walking 750 feet normally, and completing light household chores such as laundry, cleaning, and making meals without an increase in right hip pain. AR 2161. She reported being able to stand for short periods, but not long enough to complete three haircuts without an increase in pain. *Id.* In late December 2021 and early January 2022, she continued to deny hip pain, and NP Lee instructed her to taper off morphine and decrease her muscle relaxant dosage. AR 2097, 2120, 2133-34, 2142, 2145, 2154. In early January 2022, she began working in the salon again; on January 10, she reported increased tightness and needing to rest for a few days after standing for three to four hours, but on January 12, she reported completing two colors and being on her feet for three to four hours without an increase in soreness or pain. AR 2081, 2089. She rated her hip pain 0/10 on January 18, 2022. AR 2055. Toward the end of January 2022, she reported issues with her hip giving out "following [an] incident," causing sharp pain in her hip, groin, and SI joint. AR 3078-80, 3091.

---

[14] "Acetabuloplasty is a surgical procedure to correct dislocation of the hip." **Joanne G.**, 2019 WL 2303833, at *8 n.24.

The first week of February 2022, Plaintiff flew to Florida for vacation with some girlfriends, tolerating walking on vacation and prolonged sitting on the airplane (which caused some tightness in the hip that improved with stretching). AR 3061, 3079. Upon her return, on February 8, 2022, her physical therapist noted Plaintiff completed her exercises with no reports of discomfort or soreness. Plaintiff had met her long-term goals of being able to walk six to eight blocks without an increase in hip pain, to stand to complete one to three haircuts without an increase in hip pain, and to climb stairs without using the handrail; Plaintiff had not yet been confronted with snow, but the physical therapist opined she had the physical ability to scoop snow. AR 3057. The physical therapist noted Plaintiff's strength and gait had improved. *Id.* Plaintiff reported mild to no hip pain, and she had gone on volunteer EMT calls without issue. *Id.* The physical therapist indicated she would recommend to Dr. Liddell that Plaintiff could return to work. AR 3059, 3061.

The administrative record does not contain treatment notes for Plaintiff's appointment with Dr. Liddell the next day (February 9). The record does contain an FMLA form completed by physician assistant Ben Klinkhammer at Dr. Liddell's office from that date, however. PA Klinkhammer did not check that Plaintiff had any of the following problems: chronic hip pain, chronic hip stiffness, limitation of motion of hip, hip instability, or an inability to ambulate effectively (e.g., walk a block at a reasonable pace on an uneven surface, an inability to walk enough to shop or bank, or an inability to climb a few steps at a reasonable pace with the use of a single handrail). AR 1213. He did check that she had a "history of reconstructive surgery or surgical arthrodesis of hip and ability to ambulate effectively did not return, or is not expected to return, within 12 months of onset." *Id.* He stated she could not perform the lifting, pushing, and pulling as required to be an EMT. AR 1211. He indicated that she would be attending physical therapy for weakness and restricted work duties until her follow-up appointment in six weeks. AR 1213.

Later in February 2022, Plaintiff met with her therapist, her neurologist, and two consultative examiners, who all opined as to her functional limitations for her disability application and Workers' Compensation claim. AR 1215-18, 1225-32, 2518. She received an SI joint injection on February 16 and refilled her morphine at the pain clinic on February 24. AR 1226, 3012-13. During a psychiatric appointment on February 24, 2022, Plaintiff said she was completing six more weeks of physical therapy, but her surgeon did not think she would ever be able to return to work as an EMT or hairstylist. AR 3024. She admitted to working as an EMT "on a very limited basis once or twice," but denied physical work like lifting the patient, stating she had assisted other EMTs by holding the door open or taking notes. *Id.*

At Plaintiff's request, the ALJ held a video administrative hearing on March 1, 2022. AR 15, 39-40. Both Plaintiff and a vocational expert (VE) testified at the hearing. *Id.* Plaintiff testified that she could not work at the salon because cutting hair involved a lot of standing, twisting, and stooping. AR 58. She thought she could work a job that allowed her to shift positions at will between sitting and standing. AR 59.

The ALJ issued a written opinion on April 6, 2022, following the five-step process outlined in the regulations[15] to determine whether Plaintiff was disabled at any time between her alleged onset date on August 26, 2020, through the date of the ALJ's decision. AR 15-33. The ALJ found that Plaintiff suffered from severe impairments of osteoarthritis, lumbar stenosis, residuals of right hip repair, pseudo seizures, migraines,

---

[15] "During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security . . . listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." *Grindley v. Kijakazi*, 9 F.4th 622, 628 (8th Cir. 2021) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)); *see also* **20 C.F.R. § 404.1520(a)(4)**. The claimant bears the burden of persuasion to prove disability. *Goff*, 421 F.3d at 790.

anxiety disorder, and depressive disorder. AR 18. To aid in the step-four and -five determination, the ALJ determined Plaintiff's residual functional capacity (RFC),[16] finding Plaintiff could perform light work—which includes the ability to lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently,[17] and to stand, walk, and sit approximately six hours in an eight-hour day[18]—with the following additional limitations:

> [Plaintiff] can perform work that requires no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling; with no work on ladders. The claimant must avoid concentrated exposure to loud or very loud noise, vibration, fumes, and hazards. She is able to perform simple, routine tasks.

AR 21. Relying on VE testimony, the ALJ found Plaintiff could not perform her past relevant work but could work as an electric assembler, price marker, router, semiconductor bonder, lens inserter, or wire wrapper. AR 31-32. The ALJ found these jobs "exist[ed] in significant numbers in the national economy" based on the VE's testimony that 285,100 of these jobs existed nationwide. *Id.* Thus, the ALJ found Plaintiff not disabled from August 26, 2020, through April 6, 2022. AR 30.

---

[16] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

[17] Occasionally is a term of art meaning "very little up to one-third" (or two hours) of an eight-hour workday. *See* **Social Security Ruling (SSR) 96-9p**, 61 Fed. Reg. 32278, 34480 (July 2, 1996); *see also Dictionary of Occupational Titles (DOT)*, App. C, IV.c. Frequently means one-third to two-thirds (or six hours) of an eight-hour day. *See DOT*, App. C, IV.c; **SSR 83-10**, 1983-1991 Soc. Sec. Rep. 24, at 29-30 (CCH Jan. 1, 1983).

[18] **20 C.F.R. § 404.1567(b)**; **SSR 96-9p**, 61 Fed. Reg. at 34481-82. Plaintiff suggests that the ALJ's RFC is inconsistent with the state agency consultants' opinions, who specifically limited Plaintiff to walking or standing for only six hours, but they found Plaintiff could perform light work (like the ALJ). *See* AR 81, 83, 90, 93.

The Appeals Council denied Plaintiff's request for review on February 22, 2023 (AR 1-3), making the ALJ's decision that Plaintiff was not disabled the final decision of the Commissioner.[19] Plaintiff filed a timely complaint in this court on April 21, 2023 (Doc. 1).[20] The parties briefed the issues (Docs. 10, 12-13), and after briefing was completed, Plaintiff moved to remand under sentence six for the consideration of new evidence. Docs. 15-17, 30. The Honorable C.J. Williams, Chief District Judge for the United States District Court for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II. DISCUSSION

So long as substantial evidence in the record as a whole supports the ALJ's decision, a reviewing court must affirm.[21] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[22] The court "do[es] not reweigh the evidence or review the factual record de novo."[23] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[24]

Plaintiff raised two arguments in her opening brief. Doc. 10. She argued that substantial evidence does not support the ALJ's RFC finding that she could sit and stand

---

[19] *See* **20 C.F.R. § 404.981**.

[20] *See* **20 C.F.R. § 422.210(c)**.

[21] *Grindley*, 9 F.4th at 627; *accord* **42 U.S.C. § 405(g)**.

[22] *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

[23] *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

[24] *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

as necessary for light work (a total of six hours in a day each), particularly the ALJ's failure to include a limitation allowing her to shift positions at will. She also argued that the ALJ erred at step five by relying on the number of jobs that exist nationwide, without identifying the number of jobs available regionally. After briefing was completed, Plaintiff filed a motion to remand under sentence six of 42 U.S.C. § 405(g), seeking a limited remand for the Social Security Administration to consider additional medical records.

### A. The Sitting and Standing RFC Determination

Plaintiff challenges the ALJ's RFC finding with respect to her ability to sit and stand. The ALJ did not impose sitting or standing limitations apart from limiting Plaintiff to light work, thereby finding that she could sit, stand, and walk for a total of six hours in a day each with normal breaks every two hours.[25] Plaintiff argues that substantial evidence does not support the ALJ's RFC determination and that the ALJ should have included a limitation allowing her to shift positions at will between sitting and standing.

In finding that Plaintiff could sit and stand as required for light work, the ALJ concluded that Plaintiff's hip surgeries relieved her symptoms. AR 27. The ALJ noted that by February 2022, Plaintiff's physical therapist discharged her with improved gait and tolerance to all exercises, noted she had been performing haircuts and EMT calls, and thought she could return to work as an EMT. AR 24.

Even if Plaintiff could perform light work by February 2022, that does not establish that she was not disabled at any point during the relevant time period. The ALJ failed to consider whether a closed period of disability might be applicable. An ALJ may

---

[25] *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005) (noting normal breaks occur at two-hour intervals).

"award Social Security benefits either on a continuing basis, or for a "closed period."[26] In this way, disability is not an "all-or-nothing" determination.[27] A claimant may be eligible for benefits for a closed period if unable to work for at least twelve months due to disability.[28] Here, Plaintiff's initial injury occurred on August 26, 2020, and she underwent hip surgeries on July 14, 2021, and November 8, 2021. Thus, even if hip surgeries improved her symptoms, as found by the ALJ, Plaintiff could still be entitled to disability benefits for the more than twelve months between her initial injury and her improvement due to surgery.

In addition, the day after the February 2022 physical therapy appointment relied upon by the ALJ, Plaintiff had a follow-up appointment at her surgeon's office, where PA Klinkhammer ordered six more weeks of physical therapy and completed an FMLA form keeping Plaintiff off work for six more weeks. AR 1210-14, 3024. The treatment notes from this appointment are not in the record, so it is not clear what, if anything, changed from the previous day, but substantial evidence does not support the ALJ's conclusion that Plaintiff was discharged from physical therapy—although her physical therapist thought discharge was appropriate, her surgeon's office disagreed.

The ALJ also pointed to a Workers' Compensation consultative examination in February 2022. AR 26. The consultative examiner, Thomas Ripperda, MD, observed limited range of motion of the right hip flexion, extension, and external rotation (but normal internal rotation, abduction, and adduction), and his range of motion values

---

[26] ***Harris v. Sec'y of Dept. of Health & Human Servs.****,* 959 F.2d 723, 724 (8th Cir. 1992).

[27] ***Id.***

[28] *See* **42 U.S.C. § 423(d)(1)(A)**; *see also* ***Swanson v. Astrue***, No. CV 09-1737 (MJD/JJK), 2010 WL 3118785, at *20 (D. Minn. May 3, 2010) (holding that "ALJ erred by failing to consider whether [p]laintiff was entitled to a closed period of benefits" when the plaintiff improved over the relevant time period), *report and recommendation adopted,* 2010 WL 3118691 (Aug. 4, 2010).

correlated to a 15% lower extremity impairment and 6% whole person impairment under the Workers' Compensation scheme. AR 1225, 1230.[29] For her SI joint pain, he found she had 75% range of motion of her lumbar spine (with pain) as well as SI joint tenderness, which correlated to a much lower rating than the rating based on her pain questionnaire, so both values were ignored (per the Workers' Compensation guidelines); he concluded her SI joint impairment equaled "a 1% whole person impairment" based on the imaging "demonstrat[ing] normal age-related changes." *Id.* Thus, Dr. Ripperda concluded Plaintiff suffered from a 15% lower extremity permanent impairment and 7% whole person permanent impairment, which would entitle her to a certain number of weeks of Workers' Compensation benefits.[30]

Workers' compensation claims involve a different regulatory scheme and are evaluated using different standards than Social Security claims.[31] Here, Dr. Ripperda's opinion with respect to Plaintiff's hip impairment was based solely on his range-of-motion findings from a single day. Other providers evaluated Plaintiff's range of motion throughout the relevant time period, with differing results (for example, providers often observed similar or even greater range of motion with respect to hip flexion, but more limited internal rotation). AR 356, 846, 853, 870, 1031, 1931, 2010, 2990. And again, Dr. Ripperda's examination after Plaintiff's two hip surgeries does not shed any light on her ability to perform light work throughout the rest of the relevant time period before undergoing surgery.

---

[29] *See also* **Iowa Code Ann. § 85.34(2)** (permanent partial disability rating determined by using American Medical Association (AMA) guide); **Iowa Practice Series, Workers Compensation § 13.5** (noting AMA guide uses range of motion values to determine disability rating for some impairments).

[30] *See* **Iowa Code Ann. § 85.34(2)**.

[31] *See* **20 C.F.R. § 404.1504**.

Case 5:23-cv-04027-CJW-KEM   Document 31   Filed 08/12/24   Page 23 of 37

The ALJ primarily relied on Plaintiff's activities of daily living in suggesting that Plaintiff retained the RFC to perform light work even before her surgeries. "Significant daily activities may be inconsistent with claims of disabling pain,"[32] but the ALJ must consider their quality, frequency, and independence, as well as "the ability to sustain activities . . . *over a period of time*."[33] The ALJ noted that at various times in the record, Plaintiff reported cutting hair, working as an EMT, caring for and walking her dog, driving thirty minutes to an hour to appointments or to her parents' house, preparing meals, gardening and performing yard work, performing some household chores, going shopping, and flying to Florida for vacation. AR 27. But as Plaintiff notes, when considered in context, the treatment records reflect that Plaintiff's symptoms waxed and waned over the relevant time period, with periods of improvement where she was able to engage in significant activities of daily living, contrasted with periods of greater pain and limitation where she was not—often brought on as a result of overexerting herself with activities. At no time after her injury did Plaintiff work a forty-hour week cutting hair at her salon (skilled light work) or at the desk for her EMT job (sedentary work).

Here, the record is replete with references to Plaintiff's difficulties standing or sitting for long periods of time without being allowed to shift positions. Although surgery perhaps improved her functioning to the point where she could perform sitting or standing work as found by the ALJ, substantial evidence does not support the ALJ's determination that Plaintiff retained the RFC to sit or stand for two-hour increments, day in and day out, throughout the relevant time period. The ALJ failed to grapple with periods of time in which Plaintiff's RFC was clearly more limited than the ALJ found, such as in late

---

[32] *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

[33] *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007) (quoting *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005)).

December 2020 and early January 2021 and the latter half of 2021 (the time between Plaintiff's two surgeries).

I recommend remanding to the Social Security Administration for the ALJ to consider the applicability of a closed period of benefits. Additional treatment records may also shed light on whether Plaintiff's improvement after her second hip surgery lasted beyond February 2022, or whether it was instead simply another "good period" followed by a "bad period."[34]

### B. Lack of Regional Job Numbers

Once the ALJ determines that the claimant cannot perform her past work, the ALJ evaluates at step five whether the claimant can perform other work that "exist[s] in significant numbers in the national economy."[35] The Commissioner bears the burden of proving jobs exist that someone with the claimant's age, education, work experience, and RFC can perform.[36] The Commissioner may meet this burden through testimony by a VE.[37]

Here, the VE identified several jobs Plaintiff could perform and testified that a total of 285,100 positions existed nationwide (201,700 light work and 83,400 sedentary). AR 32, 69-70. The VE did not identify how many of these positions would be available regionally. Plaintiff argues that the Commissioner cannot meet his step-five burden of proving that a significant number of jobs exist in the national economy without identifying

---

[34] Plaintiff also argues that her issues with migraines and seizures support an RFC limitation allowing her to shift positions at will. As the treatment records outlined in the background section illustrate, substantial evidence supports the ALJ's conclusion that her seizures and migraines were well controlled during the relevant time period. AR 26-29.

[35] **20 C.F.R. § 404.1560(c)(1)**; *see also* **42 U.S.C. § 423(d)(2)(A)**.

[36] *See Gieseke v. Colvin*, 770 F.3d. 1186, 1189 (8th Cir. 2014); **20 C.F.R. § 404.1560(c)(2)**.

[37] *See Gieseke*, 770 F.3d at 1189.

regional jobs or some smaller subset of the entire nation.

The statute provides that work may exist in the national economy "regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work."[38] The statute defines "work which exists in the national economy" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."[39] The purpose of this definition is to preclude reliance on "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the claimant] live[s]."[40] But the purpose is also "to provide a definition of disability which can be applied uniformly throughout the nation, without regard to local hiring practices or employer preferences."[41]

Plaintiff argues that identifying the number of jobs available nationwide does not show jobs available "in several regions of the country," and thus, that the ALJ may not base the step-five determination on only national numbers. District courts in the Eighth Circuit have split on whether regional numbers are required. The District of South Dakota has repeatedly held (through four different judges) that nationwide numbers are insufficient to establish that a significant number of jobs exist in the national economy and that "numbers in the claimant's own 'region' (something less than the whole nation), or in 'several regions' (several parts that, together, consist of something less than the

---

[38] **42 U.S.C. § 423(d)(2)(A)**.

[39] *Id.*; *see also* **20 C.F.R. § 404.1566(a)**.

[40] **20 C.F.R. § 404.1566(b)**; *see also* ***Joshua G. v. Kijakazi***, No. 22-CV-91-LRR-MAR, 2023 WL 6279534, at *11 (N.D. Iowa July 26, 2023).

[41] ***Dressel v. Califano***, 558 F.2d 504, 509 (8th Cir. 1977) (citing **S. Rep. No. 90-744**, at 49 (1967), *as reprinted in* 1967 U.S.C.C.A.N. 2834, 2880-82).

whole nation)" are required.[42]  These courts have reasoned that "work which exists in the national economy" is a "term of art" that does not mean nationwide but in "several regions," and they have relied on the dictionary definition of region to conclude that "several regions" must be something less than the nation as a whole (without analyzing "several").[43]  To the extent that other courts have assumed "that *if* there are half a million jobs of a certain type nationally, *then* there are also a 'significant' number of those jobs available in the claimant's" region, the District of South Dakota has distinguished cases involving claimants who live in large cities in "highly industrial 'region[s]'" from "the very lightly-populated job-sparse markets in North and South Dakota, Nebraska, Iowa, Wyoming, [or] Montana."[44]  The District of South Dakota has rejected the argument that a large number of jobs nationally (for example, 49,000 copy machine operator positions and 68,000 clerical checker jobs) establishes jobs available "in several regions of the country" without evidence conclusively demonstrating these jobs are not "all or mostly located in Alaska or Hawaii" or "even in California and New York," even if "that is not probable."[45]

---

[42] *Webb v. Berryhill*, 294 F. Supp. 3d 824, 902-04 (D.S.D. 2018) (Judge Duffy) (400,000 jobs nationwide insufficient to meet step-five burden); *see also Born v. Kijakazi*, No. 3:21-CV-3010-MAM, 2022 WL 3139092, at *4-5 (D.S.D. Aug. 5, 2022) (Judge Moreno) (145,000 jobs nationwide insufficient); *Svendsen v. Kijakazi*, No. 1:21-CV-1029-CBK, 2022 WL 2753163, at *15, *19 (D.S.D. July 14, 2022) (Judge Kornmann) (23,000 jobs nationwide insufficient); *Melvin W v. Kijakazi*, No. CIV. 20-5050-JLV, 2022 WL 540274, at *3, *10 (D.S.D. Feb. 23, 2022) (Judge Viken) (20,000 to 25,000 jobs insufficient).

[43] *Webb*, 294 F. Supp. 3d at 903.

[44] *Heather R. v. Saul*, No. 4:20-CV-04082-VLD, 2021 WL 3080331, at *25 (D.S.D. July 21, 2021).

[45] *Springer v. Saul*, No. 4:19-CV-04030-VLD, 2019 WL 4855186, at *38 (D.S.D. Oct. 1, 2019).

Other district courts in the Eighth Circuit (the Districts of Minnesota, Nebraska, North Dakota, Eastern Missouri, and Eastern Arkansas) have held that the Commissioner may meet his step-five burden through national numbers alone.[46] These courts "have 'taken a more pragmatic approach and held that "evidence of jobs existing nationally does constitute evidence of work existing in several regions of the country, at least where there is nothing in the number of jobs or the nature of the jobs identified to indicate that those jobs would exist only in limited numbers in isolated regions of the country."'"[47] They have emphasized that the step-five significant-numbers determination is not set by regulation but rather, left to the ALJ's "common sense in weighing the statutory language as applied to a particular claimant's factual situation."[48] They have reasoned that it is counterintuitive to hold national numbers are not evidence of "work which exists in the national economy."[49] These courts have also noted that historically, "many courts appear to draw the line between a 'significant' and an insignificant number of jobs in the national

---

[46] *See, e.g.*, *Samantha M. A. v. O'Malley*, No. 22-cv-3119 (TNL), 2024 WL 841270, at *8 (D. Minn. Feb. 28, 2024) (235,000 jobs nationally); *Evert v. Kijakazi*, No. 3:21-cv-6, 2022 WL 1749611, at *7 (D.N.D. Feb. 17, 2022) (30,000 jobs nationally); *Alice T. v. Kijakazi*, No. 8:21CV14, 2021 WL 5302141, at *16-18 (D. Neb. Nov. 15, 2021) (42,000 jobs nationally); *Hayden v. Saul*, No. 4:19-CV-187-SPM, 2020 WL 888002, at *12 (E.D. Mo. Feb. 24, 2020) (200,000 jobs nationally); *Beckham v. Comm'r, Soc. Sec. Admin.*, No. 4:17-CV-564-DPM-BD, 2018 WL 1511731, at *3 (E.D. Ark. Mar. 27, 2018) (14,700 jobs nationally), *report and recommendation adopted*, 2018 WL 2069721 (May 3, 2018). One judge in the Eastern District of Missouri originally suggested that there must be "some regional reference," *Britton v. Berryhill*, No. 4:17 CV 1956 DDN, 2018 WL 4332062, at *6 (E.D. Mo. Sept. 11, 2018); but has since distinguished that case because "the Court was already remanding on other issues" and held (like other judges in that district) that the Commissioner may meet his step-five burden "by producing evidence of job numbers available within the state or broadly available nationwide," *Timms v. Saul*, No. 4:18 CV 1653 DDN, 2020 WL 247970, at *5-6 (E.D. Mo. Jan. 16, 2020).

[47] *Samantha M. A.*, 2024 WL 841270, at *7 (quoting *Alice T.*, 2021 WL 5302141, at *17).

[48] *Hayden*, 2020 WL 888002, at *11 (quoting *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997)).

[49] *Samantha M. A.*, 2024 WL 841270, at *6.

economy—without evidence of the number of jobs available locally—at around 20,000 jobs" (in cases in which the claimant did not argue regional numbers are required).[50]

The Northern District of Iowa has twice had the opportunity to address this issue, with differing outcomes. In *Joshua G.*, the court rejected the defendant's argument "that the ALJ erred by not receiving testimony from the [VE] regarding the number of jobs available locally for Plaintiff" and upheld 26,000 jobs nationally as a "significant number" when "[n]othing indicate[d] that the jobs were isolated."[51] The court relied on *Weiler v. Apfel*, in which the Eighth Circuit held the VE's testimony "that there are 32,000 surveillance monitor positions nationwide . . . . is substantial evidence supporting the ALJ's conclusion that there are a significant number of jobs in the economy which Plaintiff can perform."[52]

In *Karen E.*, the court held the ALJ erred in finding the claimant could perform two of the identified jobs, then addressed "whether the remaining job—addressor, with 18,000 addressor jobs available nationwide—is a 'significant number of jobs' as a matter of law such that" any error was harmless.[53] The court held that 18,000 jobs nationwide was "a significant number of jobs in the national economy," collecting Eighth Circuit cases (most with both national and regional numbers), as well as district court cases from outside the Eighth Circuit finding "as few as 5,000 jobs nationally" significant.[54] The court held, however, that "[a]lthough 18,000 jobs in the national economy is significant,

---

[50] *Id.* at *7 (quoting **Shari B v. Kijakazi**, No. 22-cv-1539 (DJF), 2023 WL 6130679, at *8 (D. Minn. Sept. 19, 2023)).

[51] **Joshua G.**, 2023 WL 6279534, at *10, *12 (Judge Reade).

[52] *Id.* at *11 (cleaned up) (quoting **Weiler v. Apfel**, 179 F.3d 1107, 1110-11 (8th Cir. 1999)).

[53] **Karen E. v. Kijakazi**, No. 21-CV-3015 CJW-MAR, 2022 WL 17548642, at *4 (N.D. Iowa Sept. 15, 2022) (Chief Judge Williams).

[54] *Id.* at *6-7.

the ALJ must ensure 'jobs that exist only in very limited numbers in relatively few locations outside of the region where claimant lives' are *not* used in determining the existence of work," which "necessarily includes ensuring there are at least some jobs on the regional level to guarantee an isolated job is not the basis of a denial."[55] The court noted it had been the Commissioner's past practice to obtain regional job numbers from the VE.[56] The court also stated that although "[o]ther circuits have found that national numbers—not regional numbers—satisfy the Commissioner's burden under the Act," the Eighth Circuit held in *Ellison v. Sullivan* "that a regional number must be provided in addition to the national number."[57]

In *Ellison*, the ALJ's first hypothetical incorporated all the limitations the claimant testified to, and the VE testified the lifting restrictions would preclude the claimant's past work as a forklift operator, but that "there were other industrial truck driver jobs that did not involve lifting."[58] "Because the VE did not specify what those jobs were or how numerous they were," the Eighth Circuit held the ALJ could not "rely on this testimony to establish that there are jobs in the local economy that [claimant] is capable of performing."[59] The ALJ's second hypothetical assumed the claimant could work at the "sedentary, light, or medium exertional level," and the VE testified 30,000 positions existed locally for such a person.[60] But the ALJ's ultimate RFC limited the claimant to sedentary work, and the three jobs identified by the VE for the claimant were light,

---

[55] *Id.* at *8 (cleaned up) (quoting **20 C.F.R. § 404.1566(b)**).

[56] *Id.*

[57] *Id.*

[58] ***Ellison v. Sullivan***, 921 F.2d 816, 821 (8th Cir. 1990).

[59] *Id.*

[60] *Id.*

medium, or heavy work according to the *Dictionary of Occupational Titles (DOT)*.[61] Thus, the Eighth Circuit concluded "the VE did not identify any jobs in the local economy that [claimant] was physically able to perform."[62]

Although the Eighth Circuit in *Ellison* used language concluding the VE did not identify any local job numbers, neither was there evidence of national job numbers. The VE identified no numbers at all in response to the first hypothetical and identified only local numbers in response to the second hypothetical involving a person with less limitations than claimant. The Eighth Circuit's conclusion regarding "jobs in the local economy" simply mirrored the VE's testimony (involving local jobs exceeding claimant's RFC), rather than holding that local numbers are required. It does not appear the VE in *Ellison* testified as to jobs available nationally, and therefore, that case does not stand for the proposition that national numbers, standing alone, may not support an ALJ's step-five finding.[63]

---

[61] *Id.* at 821-22.

[62] *Id.* at 822.

[63] The court in *Ellison* also quoted SSR 83-12, which is still in effect today and provides:

> A [vocational expert] can assess the effect of any limitation on the range of work at issue (e.g., the potential occupational base); advise whether the impaired person's RFC permits him or her to perform substantial numbers of occupations within the range of work at issue; identify jobs which are within the RFC, if they exist; and provide a statement of the incidence of such jobs in the region in which the person lives or in several regions of the country.

SSR 83-12, 1983-1991 Soc. Sec. Rep. Serv. 36 (Jan. 1, 1983). The Eighth Circuit omitted the part about "several regions of the country," concluding the excerpt after stating the VE's job is to identify jobs "in the region in which the person lives." *Ellison*, 921 F.2d at 821. I do not find this significant. The Eighth Circuit was focused on VE testimony regarding local jobs because that was the only VE testimony in evidence in that case. I do not find the Eighth Circuit meant to change the statutory and regulatory standard and hold that evidence of jobs "in several regions of the country" cannot meet the Commissioner's step-five burden.

31

On the other hand, the Eighth Circuit has seemingly upheld the ALJ's step-five determination based on just national numbers on at least one occasion (without addressing whether regional numbers are required).  In *Weiler*, plaintiff pointed to inconsistencies with the *DOT* to argue he could not perform the four jobs the VE identified for him.[64] The Eighth Circuit held it "need not exhaustively compare [plaintiff's RFC] to every job recommended by the [VE]," since "[t]he [VE] testified that there are 32,000 surveillance monitor positions nationwide," and plaintiff could perform this job based on his RFC.[65] The court concluded the VE's "testimony in response to the ALJ's hypothetical is substantial evidence supporting the ALJ's conclusion that there are a significant number of jobs in the economy which [plaintiff] can perform."[66]  Thus, the Eighth Circuit appeared to hold that 32,000 positions nationwide is evidence of a significant number of jobs in the national economy for purposes of step five.

Other circuit courts have rejected the argument that national numbers alone may not support the ALJ's step-five finding, albeit in unpublished decisions.[67]  The Ninth

---

[64] 179 F.3d at 1110.

[65] *Id.* at 1110-11.

[66] *Id.* at 1111.

[67] *McCall v. Saul*, 844 F. App'x 680, 681-82 (4th Cir. 2021) (per curiam) ("hold[ing] that evidence of jobs existing nationally constitutes evidence of work existing in several regions of the country, at least where there is nothing in the number of jobs or the nature of the jobs identified to indicate that those jobs would exist only in limited numbers in isolated regions of the country," and concluding that 81,000 jobs nationwide was "large enough to infer that the jobs were available in several regions of the country"); *Garcia v. Comm'r, SSA*, 817 F. App'x 640, 649-50 (10th Cir. 2020) (rejecting argument that evidence of regional jobs is required and upholding finding that 20,500 to 22,000 jobs nationwide is a significant number); *Wood v. Comm'r of Soc. Sec.*, No. 19-1560, 2020 WL 618536, at *6 (6th Cir. Jan. 31, 2020) (rejecting argument that regional numbers are required and holding that 467,000 jobs "available nationally [was] sufficient to carry the Commissioner's burden, without requiring testimony that specifies particular regions in which those jobs are available"); *Lirley v. Barnhart*, 124 F. App'x 283, 283-84 (5th Cir. 2005) (per curiam) (when plaintiff argued nationwide numbers "establish[d] neither the number of jobs existing in the claimant's region nor the number of geographic

Circuit has stated (in cases in which the VE provided both regional and national numbers) that a "'significant number of jobs' can be *either* regional jobs (the region where a claimant resides) *or* in several regions of the country (national jobs)."[68] Circuit courts (and the Northern District of Iowa) have also held national numbers support the ALJ's step-five finding without addressing whether regional numbers are required.[69]

---

locations where the jobs exist," upholding step-five determination based on evidence that 50,000 jobs plaintiff could perform existed nationwide); ***Brun v. Barnhart***, 126 F. App'x 495 (1st Cir. 2005) (per curiam) (affirming for "the reasons stated in the magistrate judge's [adopted] Report and Recommendation" and citing the Eighth Circuit's decision in *Jones* for the proposition that the "presence of 75,000 surveillance system monitor jobs nationwide represents 'substantial gainful work which exists in the national economy'"; the underlying report and recommendation, No. 03-44-B-W, 2004 WL 413305, at *5-6 (D. Me. Mar. 3, 2004), addressed for purposes of harmless error whether the one remaining job, of which there were 150,000 nationally and 40 locally, constituted a "significant number" and agreed with the Commissioner that even if 40 regionally was not a significant number, "150,000 nationally is sufficient to meet the 'significant number' requirement").

[68] ***Beltran v. Astrue***, 700 F.3d 386, 389-90 (9th Cir. 2012) (ultimately finding neither 135 jobs regionally nor 1,680 nationally was a significant number); *see also **Gutierrez v. Comm'r of Soc. Sec.***, 740 F.3d 519, 528-29 (9th Cir. 2014) (holding that 2,500 regional jobs was a significant number but that even if the court were to conclude otherwise, 25,000 jobs nationwide "represents a significant number of jobs in several regions of the country" and "likely does not fall into the category of 'isolated jobs' existing in 'very limited numbers'").

[69] ***Milhem v. Kijakazi***, 52 F.4th 688, 695-97 (7th Cir. 2022) (holding that 89,000 jobs nationwide was a significant number against a challenge that it was not significant because it amounted to only a small percentage of the total jobs in the national economy; no argument regarding the need for regional numbers); ***Valdez v. Comm'r of Soc. Sec.***, 808 F. App'x 1005, 1009-10 (11th Cir. 2020) (per curiam) (holding on harmless-error review that 78,000 jobs nationally was a significant number); ***Engledow v. Saul***, No. 20-CV-00004-LRR, 2021 WL 1593256, at *5 (N.D. Iowa Feb. 16, 2021) (for purposes of harmless-error doctrine, remaining jobs—90,000 nationwide—constituted significant number), *report and recommendation adopted,* 2021 WL 916925, at *3-4 (Mar. 10, 2021) (reviewing for clear error); ***Loeckle v. Saul***, No. C19-3031-LTS, 2020 WL 5518620, at *11-12 (N.D. Iowa Sept. 14, 2020) (for purposes of harmless-error doctrine, remaining jobs—85,000 nationwide—constituted significant number), *vacated and remanded,* No. 20-3373, 2021 WL 5365233 (8th Cir. June 4, 2021) (vacating in light of Supreme Court's Appointments Clause decision).

33

I agree with the majority of courts that have found regional numbers are not necessarily required to show work exists in significant numbers in the national economy. As a matter of common sense, a large number of jobs available nationwide is a "significant number of jobs in the national economy." And I do not find reliance on national numbers inconsistent with the statutory definition requiring work in "several regions of the country." "Several" can mean "more than two but not very many"; under this definition, identifying jobs in many regions through nationwide numbers would not identify jobs "in several regions of the country."[70] But "several" can also simply mean "more than one" (particularly in legal use).[71] As other courts have held, when neither the number of jobs existing nationwide nor the type of job suggests that it is limited to isolated regions of the country, the ALJ may infer that a large number of positions available nationwide exist in many ("several") regions. This interpretation is the most consistent with the deferential substantial-evidence standard.

Here, the DOT descriptions of the jobs identified by the VE do not suggest that they are limited to a particular region: an electric assembler who assembles electrical parts using tools;[72] a price marker who conducts inventory and places price stickers on merchandise;[73] a router who determines routes for packages based on standardized charts and then labels the packages accordingly;[74] a semi-conductor bonder who operates a

---

[70] *See, e.g.*, **Oxford English Dictionary**, Several https://www.oed.com/dictionary/several_adj?tab=meaning_and_use#23468542 (last accessed August 9, 2024); **Merriam-Webster**, Several, https://www.merriam-webster.com/dictionary/several (last accessed August 9, 2024).

[71] *Id.*

[72] **DOT § 729.684-054**.

[73] **DOT § 209.587-034**.

[74] **DOT § 222.587-038**.

machine to bond gold or aluminum wire to an electrical circuit;[75] a lens inserter who works on a production line placing lenses into plastic sunglasses frames;[76] and a wire wrapper who uses an adhesive and fabric to cover the wires in thermostats used in heating pads.[77]  The large number of positions that exist—285,100 nationwide—also suggests that these jobs are not limited to a single region.[78]

Accordingly, I do not find that the lack of regional job numbers provides an independent basis for remand.  Even if Plaintiff were limited to sedentary work, courts have generally upheld an ALJ's step-five finding based on VE testimony that 83,400 positions exist nationwide.  I recommend holding that regional numbers are not required.

### C. Additional Medical Records

After briefing on the merits was completed, Plaintiff moved for a limited remand to consider additional medical records.  Doc. 15.  There are two types of remands in Social Security appeals:  sentence-four remands and sentence-six remands.[79]  Sentence-four remands, based on the fourth sentence of 42 U.S.C. § 405(g), "authorize[] a court to enter 'a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing.'"[80]  Sentence six of that statute, on the other hand, authorizes remands "where new and material evidence is adduced that was for good cause not presented during the administrative

---

[75] **DOT § 726.685-066**.

[76] **DOT § 713.687-026**.

[77] **DOT § 723.687-010**.

[78] *Karen E.*, in which the court required regional numbers, can be distinguished, as it involved a much smaller number of jobs existing nationwide—18,000.

[79] ***Buckner v. Apfel***, 213 F.3d 1006, 1010 (8th Cir. 2000).

[80] ***Id.*** (quoting **42 U.S.C. § 405(g)**).

Case 5:23-cv-04027-CJW-KEM   Document 31   Filed 08/12/24   Page 35 of 37

proceedings."[81] Unlike a sentence four remand, a sentence six remand "does not rule in any way as to the correctness of the administrative proceeding."[82] Plaintiff's briefing on the merits requests a sentence-six remand, but Plaintiff's motion to remand requests a sentence-four remand in the alternative, seeking a limited remand for the ALJ to consider additional medical records, after which the case would return to this court.

District courts in the Eighth Circuit have denied motions to remand under sentence six as moot when the court has already determined remand under sentence four appropriate.[83] In *Brown v. Colvin*, a district court in the Western District of Tennessee recognized some authority for a "dual basis remand."[84] But the court noted "other courts have found it to be more appropriate to order a Sentence Four remand only and to relinquish jurisdiction but order that the ALJ consider additional evidence upon remand."[85] The court noted the latter course of action "particularly preferable if the 'new sentence six material . . . is almost inseparably connected to the basis of the sentence four remand.'"[86]

---

[81] *Id.*

[82] *Id.* (quoting *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991)).

[83] *See Camacho v. Saul*, No. CV 19-5126, 2019 WL 5727642, at *1 (W.D. Ark. Nov. 5, 2019) (granting "Commissioner's unopposed motion to remand . . . pursuant to 'sentence four'" and denying as moot claimant's motion to "remand for consideration of new and material evidence"); *Young v. Shalala*, No. 94-3011-CV-S-5, 1995 WL 904826, at *1 (W.D. Mo. May 31, 1995) (remanding under sentence four for award of benefits and denying as moot motion to remand under sentence six); *Stillings v. Shalala*, No. CV 4-94-70531, 1995 WL 382707, at *4 (S.D. Iowa May 11, 1995) (remanding under sentence four for further proceedings and denying as moot motion to remand under sentence six); *see also Borman v. Comm'r of Soc. Sec.*, No. 2:12-cv-509, 2013 WL 3935028, at *1 (S.D. Ohio July 30, 2013) (same).

[84] No. 1:13-CV-01242-cgc, 2017 WL 634710, at *7 (W.D. Tenn. Feb. 16, 2017).

[85] *Id.* (collecting cases).

[86] *Id.*

Here, Plaintiff argues new medical records from February 2022 and beyond show that her hip surgeries and physical therapy were not the cure-all to her problems, as found by the ALJ. Because her symptoms waxed and waned throughout the relevant time period, and because I have already found the ALJ erred by focusing on medical records from a period of improvement in February 2022, I find that the basis for Plaintiff's motion to remand is intertwined with the issues raised in her merits brief. I recommend denying the motion to remand as moot, given that I recommend remanding under sentence four.[87]

## III.  CONCLUSION

I respectfully recommend **reversing** the decision of the Social Security Administration and **remanding** for further proceedings. I recommend **denying** the motion to remand (Doc. 15) as moot.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[88] Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[89]

**DONE AND ENTERED** on August 9, 2024.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[87] I therefore do not address the Commissioner's argument that Plaintiff forfeited any argument for a sentence-four remand by failing to timely raise the issue.

[88] **Fed. R. Civ. P. 72**.

[89] *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

37